Filed 4/7/23  In re G.Z. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re G.Z. et al., Persons Coming Under the Juvenile Court Law. | B320543 (Los Angeles County Super. Ct. No. 20CCJP02356C, E–H) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>Y.L.,<br><br>    Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Tara L. Newman, Judge.  Affirmed.

Jesse F. Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Interim County Counsel, and Kim Nemoy, Assistant County Counsel, and Jacklyn Kim Louie, Deputy County Counsel, for Plaintiff and Respondent.

———————————————————

Y.L. (mother) and D.Z. (father) (collectively parents) have nine children together, all of whom are dependents of the juvenile court. In March 2022, the juvenile court terminated parents' parental rights to five of their children. In this appeal, mother challenges the juvenile court's termination of her parental rights as to two of those five children—her six-year-old daughter, G.Z. (daughter) and her almost four-year-old son, M.Z. (son). Father did not appeal the court's orders terminating parental rights. On appeal, mother argues the juvenile court erred because it failed to apply the beneficial parental relationship exception to adoption. We find no error and affirm.

## BACKGROUND

### 1. Previous Appeals, Proceedings, and Events

The instant appeal is not the first time this family has been before us. Parents have filed five separate appeals. First, mother and father appealed the juvenile court's December 2020 removal order as to their oldest son. In a nonpublished opinion, we affirmed the removal order. (*In re W.Z.* (Mar. 11, 2022, B309689) (first appeal).) Second, mother and father appealed the juvenile court's August 2021 jurisdictional findings and removal order as to their youngest child. In a nonpublished opinion, we affirmed the court's findings and order. (*In re M.Z.* (Dec. 2, 2022,

2

B314485) (second appeal).) Third, mother and father appealed a November 2021 order regarding educational and developmental rights as to their youngest child (B317258). Those appeals were dismissed in accordance with *In re Phoenix H.* (2009) 47 Cal.4th 835. Fourth, mother filed the instant appeal regarding termination of parental rights to two of her children. Fifth, following the instant appeal, mother and father also appealed the juvenile court's July 2022 order terminating parental rights to their youngest child (B322390). Those most recent appeals were dismissed (mother's appeal was dismissed under *In re Phoenix H.*, *supra*, 47 Cal.4th 835, and father's appeal was dismissed for failure to file an opening brief). The parents also filed a joint writ petition in pro per challenging the juvenile court's order setting a permanency planning hearing (B318240). That petition was dismissed.

Rather than repeat the facts of this case up to the point of parents' second appeal (challenging the juvenile court's August 2021 order), we incorporate by reference our opinions in both the first and second appeals and summarize here the most pertinent facts from those opinions.

The underlying dependency proceedings began in April 2020. In December 2020, the juvenile court declared mother and father's eight older children dependents of the court and removed them from mother and father's custody. The court's findings and orders were based both on father's egregious sexual abuse, including rape, of his oldest daughter (the children's half sister) when she was a minor, which abuse resulted in half sister giving birth to father's daughter, and mother's failure to protect the children from father. Later, the juvenile court also declared mother and father's youngest child, born during the pendency of

3

the underlying proceedings, a dependent of the court and ordered him removed from parents as well.

At the disposition hearing held in December 2020, the juvenile court ordered mother to complete a parenting program, individual counseling (which was to include sexual abuse awareness and child protectiveness), conjoint counseling with the children if recommended by their therapists, and a mental health evaluation. The court ordered father to complete sexual abuse counseling for perpetrators, individual counseling (which was to include parenting), and a mental health evaluation. Both parents were ordered not to post information on-line about the case or anyone involved with the case. Parents were granted monitored visits with the children. In March 2021, mother and father each completed a 15-hour parenting program.

Mother and father also each submitted to a mental health evaluation performed by court-appointed expert Dr. Johnny Wen. Dr. Wen reported there was "no doubt" father "suffers from a serious personality disorder." Among other things, Dr. Wen noted father lacked both remorse for and insight into his past conduct. As to father, Dr. Wen stated he had no "evidence of change, regret, remorse, responsibility, concern, reparations, active pursuit of counseling and classes, or quite frankly, any progress towards some level of improvement." As to mother, Dr. Wen noted she was wholly dependent on father, was in denial about father's past conduct, and did not display independent thinking. Dr. Wen concluded father "should not have a minor under his care" and opined mother was "unable to independently care for her children without relying on her husband" and "[t]he impedance by [father] will likely pose mental health and safety concerns for any minors under their care."

4

When the underlying proceedings began in April 2020, and the children were removed from parents, daughter was four years old and son was two years old. Although they have been placed in a few different homes, the children remained removed from their parents' custody for the entirety of the underlying proceedings. In April 2021, because father had posted confidential information on-line about daughter and son's caregiver at the time, that caregiver requested the children be removed from her home. In late-April 2021, daughter and son were placed with Mr. and Mrs. L. (caregivers), with whom they have remained.

Both daughter and son displayed signs of needing special services. Daughter was referred to her school district for speech therapy. Son was referred to the Regional Center for developmental delays and later to his school district. In both instances, mother and father refused to consent to an assessment or treatment. Eventually, daughter's speech improved and she no longer needed services. However, although not yet school age, son qualified for an Individualized Education Plan (IEP) for "special education with speech therapy."

## 2. Events Since the Second Appeal

### a. Continuation of Reunification Period

In August 2021, although the juvenile court found mother and father's progress with their case plans had not been substantial, the court continued reunification services for parents.

In September and October 2021, the Los Angeles County Department of Children and Family Services (Department) reported mother and father had visited consistently with the children. The Department noted mother and father "attended

the family's visitations regularly. They maintained proper communication and interaction with their children. The mother missed 4 visits while the father missed 2 visits between April and May, as they took turn to stay home to care for newborn [their youngest child]. [Department social workers] and HSA monitored all visits." Mother and father brought food and clean clothes for the children, corrected them appropriately, and cleaned them before the conclusion of their visits. The children enjoyed the visits and looked forward to them. The Department reported, "In general, both parents have had quality time with their children during the visitations."

Besides visits with her children, however, and especially after the removal of her newborn son, mother was not particularly involved in the dependency proceedings. She refused to participate in court proceedings or meetings with Department staff. Father often answered her telephone. Sometimes mother referred case workers to speak with father instead of her. Father continued to insist the Chinese Communist Party (CCP) was spying on him and his family and wanted to hurt them. He believed the CCP had infiltrated all aspects of this dependency case. Father stated neither he nor mother had mental health issues, and neither needed mental health services. They did not believe they had done anything wrong.

In October 2021, parents filed multiple Welfare and Institutions Code section 388 petitions for modification, seeking return of their children and for the juvenile court to terminate its jurisdiction.[1] The juvenile court summarily denied the petitions.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

6

In November 2021, the Department reported father continued to deny he or mother had mental health issues, insisted they did not need help, refused to allow an alleged service provider to release information to the Department, rejected any suggestion he had done anything wrong, and continued to claim "the Department was sent to go after" him and his family. One therapist who spoke with father stated "father did not have any insight as to his issues or concerns over his capability to care for his children. [The therapist] felt that she would not be able to help or improve the father on his conditions." The Department also reported its social workers repeatedly advised father not to allow his children to play near an active driveway during visits. Father rejected their advice. The Department also noted one of its social workers had invited the parents to attend a meeting regarding their family's case issues. Mother and father declined to attend or participate in the meeting.

Throughout the proceedings, and despite multiple admonitions to stop, father continued to post confidential information on-line about both the case and individuals involved in the case. Father continued to espouse his paranoid and delusional beliefs. Mother voiced no opposition to father but instead stated she shared his beliefs. Mother showed no independence or indication that she would deviate from father.

### b.     Termination of Reunification Services

The 18-month review hearing was held on November 19, 2021. Counsel for parents' oldest son noted the oldest son wanted to reunify with his parents. Similarly, counsel for the oldest daughter indicated the oldest daughter wanted to return to mother's care. Neither attorney, however, joined in or supported

7

the older children's wishes to reunify. Instead, counsel argued the juvenile court should terminate reunification services for the parents. Although counsel acknowledged parents had "been consistently visiting and the children enjoy their visits," counsel also explained parents had "been hesitant to engage with the Department in services and have repeatedly told service providers that they do not need any help." Moreover, counsel pointed out father suffered from a delusional disorder and had failed to take responsibility or show insight into his behaviors, which had brought the family to the Department's attention. Also, mother could not separate from father or independently care for the children. Counsel for the Department similarly argued the juvenile court should terminate reunification services for parents. Counsel noted parents had not participated in services and took no responsibility for, and had no insight concerning, the Department's involvement with their family.

On the other hand, attorneys for mother and father both argued the juvenile court should return the children to their parents' custody and care. Counsel noted visits with the parents were consistent and appropriate, and the children were bonded to their parents. Counsel for father also argued the Department had failed to offer reasonable services. At the least, counsel for mother requested the court find exceptional circumstances to extend reunification services.

After hearing argument, the juvenile court found "father denies responsibility and is not accountable for the actions which have resulted in this case beginning in the first place. Both parents demonstrate a lack of insight and understanding of the impact of their own behaviors, as well as the issues that need to be addressed in this case. [¶] They have not cooperated or

8

substantially participated in their case plans and continue to minimize the issues that the court is asking them to address. Additionally, it appears that mother is dependent on her husband and influenced by him for a variety of reasons, making it really not reasonable to return children to her separately, if that were even an option, because of the nature of their relationship." The court further found the parents' progress toward alleviating or mitigating the causes necessitating placement had not been substantial. The court terminated reunification services for the parents as to five of their children, including daughter and son.

Following termination of reunification services, mother and father filed section 388 petitions for modification asking the juvenile court to terminate jurisdiction and return five of the children to the parents. The juvenile court summarily denied the petitions, finding they did not state new evidence or a change of circumstances.

### c.     Permanency Planning Hearing

Shortly before the permanency planning hearing, the Department submitted a report for the court. The Department noted the parents had been compliant with their monitored visitation and, although both had completed their mental health evaluation (performed by Dr. Wen) as previously ordered by the court, neither parent had enrolled in individual counseling and father had not enrolled in sexual abuse counseling.

In contravention of repeated and explicit court orders, father continued to post information about the case on-line. Most concerning, in a March 2022 on-line post, father mentioned the "murder of" and killing of a Department social worker involved in the case. For example, father posted, "The murder of [Department social worker] is the only option!"

9

As to the parents' visits with the children, the Department reported the visits had been "regular and consistent," and the parents were "attentive and nurturing to the children during the visits." The parents visited with all their children at a public park for six hours every Saturday and every other Sunday. Daughter and son were eager each week for their visits. However, in addition to father's stubbornness in allowing the children to play in what the monitors believed to be an unsafe area (an active driveway), the Department noted parents brought mostly sugary and snack foods to each visit. The caregivers reported the children were hyper and dirty after their visits with parents. The caregivers also expressed fears that father might post information about them on-line. Thus, the caregivers were careful not to disclose their names to the children. The caregivers asked that visits with parents stop if parental rights were terminated.

The Department also reported daughter and son were thriving in their placement with caregivers. The children referred to their caregivers as "auntie" and "uncle." Daughter was happy and enjoyed kindergarten. She said she liked her caregivers, was happy living with them, and was loving toward them. Son was described as "smart and grumpy." Son described the caregivers as "nice and fun." He displayed "happiness and comfort in the home." Both children were enrolled in individual therapy. The caregivers wanted to adopt daughter and son and had completed all necessary paperwork to do so. The Department reported as to the caregivers for daughter and son, the case was "adoption ready" and there were "no impediments" to adoption.

At the permanency planning hearing held on March 17, 2022, the Department sought the termination of parental rights as to five of parents' children, including daughter and son. The Department argued the beneficial parental relationship exception to adoption did not apply. Counsel for those five children agreed the juvenile court should terminate parental rights and that the beneficial parental relationship exception to adoption did not apply.

On the other hand, mother's counsel argued the court should not terminate her parental rights. Additionally, counsel argued the beneficial parental relationship exception applied. Counsel noted visits with the children had been consistent and positive, and the children enjoyed their time with parents. Counsel argued the children and parents shared a bond, which, if broken, would be detrimental to the children and not in their best interests. Counsel for father also argued against termination of parental rights and noted the existence of a bond not only between parents and children but also between the siblings.

After hearing argument, the juvenile court terminated mother and father's parental rights as to five of their children, including daughter and son. The court held the beneficial parental relationship exception to adoption did not apply. Although the court found parents visited with the children regularly and appropriately, the court further found terminating the parental relationship would not be detrimental to the children and the benefits of adoption outweighed continuing the parental relationship. Additionally, after hearing argument concerning what father meant in recent on-line statements concerning the "murder" of a Department social worker, the juvenile court found at least some of those statements to be

11

"threatening," not to mention a further violation of the court's repeated orders not to post on-line about the case. The court ordered no further visits for parents with the five children for whom parental rights had been terminated. However, the court ordered a referral so that the siblings could continue to visit each other. The court designated caregivers the prospective adoptive parents of daughter and son.

### d. Appeal

On May 16, 2022, mother appealed the juvenile court's March 17, 2022, orders. Although mother's notice of appeal lists all five children who were subject to the court's March 17, 2022, orders terminating parental rights, on appeal mother challenges those orders only as they relate to daughter and son. Father did not appeal the March 17, 2022, orders.

While mother's appeal was pending, mother and father jointly submitted a letter to this court requesting self-representation on appeal. In their letter, parents continued their allegations of the CCP's large-scale campaign of fraud and deception against them. We denied parents' request for self-representation.

## DISCUSSION

### 1. Applicable Law

At the permanency planning hearing, the juvenile court may terminate parental rights only upon finding the child is likely to be adopted and no statutory exception to adoption applies. (§ 366.26, subds. (b) & (c)(1).) Here, it is undisputed the children were likely to be adopted. Thus, our focus is whether a statutory exception to the termination of parental rights applies.

The exception mother raises is the beneficial parental relationship exception. This exception is set forth in section

366.26, subdivision (c)(1)(B)(i), which provides:  "[T]he court shall terminate parental rights unless . . . [¶] . . . [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances:  [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

To establish this exception, the parent must prove the following three elements:  "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)  "[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.]  By making this decision, the trial court determines whether terminating parental rights serves the child's best interests."  (*Id.* at p. 632.)  " 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights."  (*Id.* at p. 633.)  The " 'statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' "  (*Id.* at p. 631.)

2.   **Standard of Review**

When reviewing an order terminating parental rights and rejecting application of the beneficial parental relationship exception, we apply a hybrid standard of review.  On the one

13

hand, "[a] substantial evidence standard of review applies to the first two elements [of the exception]. The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.)

On the other hand, the juvenile court's determination on the third element is reviewed for an abuse of discretion. As to the third element, the juvenile court "makes the assessment by weighing the harm of losing the [parent-child] relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

"In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' [Citation.] But ' " '[w]hen two or more

14

inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' " (*Id.* at p. 641.)

"At its core," this hybrid standard of review "embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Caden C., supra,* 11 Cal.5th at p. 641.)

### 3.    No Error

It is undisputed mother visited regularly with the children, both of whom appeared to enjoy their time with mother, father, and their siblings.  Thus, we conclude mother met the first element of the beneficial parental relationship exception— regular visitation and contact with the children.  We assume mother met the second element; i.e., the children would benefit from continuation of their relationship with mother. (*Caden C., supra,* 11 Cal.5th at p. 632.)

Nonetheless, the beneficial parental exception to adoption does not apply because mother failed to prove its third element.  In other words, it was not an abuse of discretion to conclude the benefits to the children of an adoptive home outweighed any harm from terminating mother's parental rights. (*Caden C., supra,* 11 Cal. 5th at pp. 631–632.)

Here, daughter and son were removed from their parents' custody and care at a young age.  When they were first removed, daughter was four years old and son was two years old.  By the time of the permanency planning hearing, daughter and son had been removed from their parents' custody for almost two years.

They had been living with caregivers (their prospective adoptive parents) for close to one year. Daughter and son were bonded with caregivers and "thriving" in their care. Caregivers were providing the nurturing and care daughter and son required, including support for son's developmental delays and need for an IEP. Caregivers were dedicated to the children.

Mother points to her record of consistently positive monitored visits with daughter and son, claiming this demonstrates her strong bond with the children. Notwithstanding her positive visits, however, mother has not established that termination of her parental rights would be detrimental to daughter and son. Although mother visited with all her children once or twice a week and everyone enjoyed their time together, this does not rise to the level of " 'a significant, positive, emotional attachment' " the protection of which would warrant maintaining mother's parental relationship with daughter and son. (*Caden C.*, *supra*, 11 Cal.5th at pp. 632, 633.)

Rather, the record amply supports the finding that termination of mother's parental rights was in fact in daughter and son's best interests. Mother does not address Dr. Wen's expert opinion and his safety concerns for any minors in her care. As noted above, Dr. Wen opined mother was "unable to independently care for her children without relying on her husband" and "[t]he impedance by [father] will likely pose mental health and safety concerns for any minors under their care." The juvenile court also recognized mother's dependence on father. Like father, mother has a history of refusing help because of father's influence and her own paranoia. For example, when services were suggested for both daughter and son, mother refused her consent. She also did not address, or even try to

16

address, her own mental health issues. Parents' paranoid and delusional world view continued unabated throughout the underlying proceedings.

We conclude the juvenile court did not abuse its discretion when it found the benefits and security of adoption by caregivers outweighed any harm from terminating mother's parental relationship with daughter and son. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) Thus, the juvenile court did not err when it held the beneficial parental relationship exception to adoption did not apply.

## DISPOSITION

The juvenile court's March 17, 2022, orders are affirmed. NOT TO BE PUBLISHED.

LUI, P. J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.

17